*David Leander Ford v. State of Maryland*, No. 2193, September Term, 2016. Opinion filed on December __, 2017, by Berger, J.

**HEADNOTES**

TRIAL PROCEDURE - CHARACTER EVIDENCE - VICTIM'S TRAIT OF PEACEFULNESS

In a homicide case, the prosecutor may offer evidence of the alleged victim's trait of peacefulness to rebut evidence that the victim was the first aggressor.

TRIAL PROCEDURE - CHARACTER EVIDENCE - VICTIM'S TRAIT OF PEACEFULNESS

Trial court did not abuse its discretion when it allowed the State to offer testimony of the victim's trait of peacefulness before any evidence was admitted to show that the victim was the first aggressor, where the defense clearly stated in its opening statement that the victim was the first aggressor and suggested that it would introduce evidence on this point.

CRIMINAL PROCEDURE - CONSCIOUSNESS OF GUILT EVIDENCE

Consciousness of guilt evidence is admissible because the particular behavior provides clues to the person's state of mind, which is relevant because the commission of a crime can be expected to leave some mental traces on the criminal.

CRIMINAL PROCEDURE - CONSCIOUSNESS OF GUILT EVIDENCE

Evidence of post-crime conduct must satisfy four inferences to be admissible to show consciousness of guilt: (1) from the defendant's conduct, a desire to evade prosecution or conceal evidence; (2) from a desire to evade prosecution or conceal evidence, consciousness of guilt; (3) from consciousness of guilt, consciousness of guilt with respect to the charged offenses; and (4) from consciousness of guilt with respect to the charged offenses, actual guilt.

CRIMINAL PROCEDURE - CONSCIOUSNESS OF GUILT EVIDENCE

Testimony that the defendant had responded angrily when asked to leave the house where he had been hiding from the police was admissible to show defendant's consciousness of guilt.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2193

September Term, 2016

_____

DAVID LEANDER FORD

v.

STATE OF MARYLAND

_____

Graeff,
Berger,
Krauser, Peter B.
   (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Berger, J.

_____

Filed:  December 20, 2017

Following a jury trial in the Circuit Court for Anne Arundel County, appellant David Leander Ford ("Ford") was convicted of second degree murder and was sentenced to twenty-five years in prison with all but twenty years suspended. The circuit court further ordered that Ford be placed on probation for five years following his release.

On appeal, Ford raises four questions for our review, which we have rephrased as follows:

1. Whether the circuit court erred in denying Ford's motion to suppress his statements to police.

2. Whether the circuit court abused its discretion in allowing the State's witnesses to testify regarding the victim's character for peacefulness.

3. Whether the circuit court erred or abused its discretion in allowing a State's witness to testify regarding Ford's reaction to being told that he had to leave her house.

4. Whether the circuit court abused its discretion in limiting Ford's cross-examination of a State's witness.

For the reasons stated herein, we shall affirm.

## FACTS AND PROCEEDINGS

We set forth the facts in the light most favorable to the prevailing party below. On the evening of July 8, 2015, Mohamed Eltahir ("Eltahir") was sitting on a park bench with Everett Kane ("Kane"). Ford arrived holding some grocery bags, which he put down at the end of the walkway before sitting on the bench with Eltahir and Kane. Eltahir and Kane were drinking alcohol, but Kane testified that Eltahir did not appear to be drunk. Barbara McQueen ("McQueen") and her friend, Kathy, were sitting on another bench.

Two women walked by the bench where Ford was sitting, and Ford made a lewd comment about Eltahir's sister. An argument ensued and quickly escalated. Ford hit Eltahir first, and Eltahir struck back. At some point during the altercation, Ford drew a knife and stabbed Eltahir in the chest. Ford asked Kane to grab his bags, and the two of them fled the scene. Although Ford had a cut on his arm, nobody had seen Eltahir use a knife, and there was no evidence that Eltahir was in possession of a knife. Eltahir died from the wound in his chest inflicted by Ford.

Thereafter, Ford went to the house of Sheila Brown ("Brown"), his former girlfriend, to avoid the police. Brown let him stay the night, but the next morning she told him to leave. Ford cursed her and left, slamming the front door. When he exited the building, he was tackled by police in the front parking lot.

After Ford was arrested, he was placed in the unmarked vehicle of Detective William Ballard ("Detective Ballard"). Detective Ballard did not ask Ford any questions about the reasons for his arrest. As detectives approached Brown's residence, Ford said that "they had nothing to do with this," that the detectives were "not going to find anything," and that he "hid the knife in the county." When Ford told Detective Ballard that he had not eaten and that he had low blood sugar, Detective Ballard stopped to get Ford some food. Later, Ford began to talk about the incident again, saying, "[h]e cut me," at which point Detective Ballard advised Ford of his *Miranda* rights. Ford did not say anything else to Detective Ballard.

Detective Ballard took Ford to an interrogation room at the Criminal Investigation Division ("CID"). Ford was left in the room, where he ate his breakfast and fell asleep.

One hour and nine minutes later, Detective Kelly Harding ("Detective Harding") and Detective Jason McNemar ("Detective McNemar") entered the room. Ford told the detectives that he was cold, and they turned down the air-conditioning. When Detective Harding asked Ford about the cut on his arm, he told her that he needed stitches. Detective Harding read Ford his *Miranda* rights and began to question him. At one point, Ford told the detectives that he is "schizophrenic with bipolar, seizures, and everything" and that he had not taken his medication. The detectives also learned that Ford had not taken his medication for diabetes in a couple of days. Ford made a number of incriminating statements to Detectives Harding and McNemar. Indeed, Ford exclaimed, "Lord, forgive me for what I've done, help me." Recounting the altercation with Eltahir, Ford said, "That's when I told him, 'You done messed up,' and I cut him." Ford also told the detectives where he hid the knife.

We shall set forth additional facts as necessitated by our discussion of the issues on appeal.

## I. The Circuit Court Did Not Err In Admitting Ford's Statements to Police.

Ford argues that the statements he made in custody were involuntary due to his "weakened and distressed mental and physical state." Ford further contends that the confession he made during his interrogation at CID was improperly induced in exchange for medical treatment. Although Ford waived his *Miranda* rights, Ford claims that his waiver was neither knowing nor voluntary. Based on our review of the record, we hold that Ford spoke voluntarily to the police at all times and that the waiver of his *Miranda* rights was knowing and voluntary.

3

In reviewing the denial of a motion to suppress evidence, "we confine ourselves to what occurred at the suppression hearing," which we view "in a light most favorable to the prevailing party on the motion." *Lee v. State*, 418 Md. 136, 148 (2011); *see also Daniels v. State*, 172 Md. App. 75, 87 (2006). Although we defer to the trial court's factual findings "unless they are shown to be clearly erroneous," we will undertake "our own independent constitutional appraisal, by reviewing the relevant law and applying it to the facts and circumstances of this case." *Id.* at 148-49. The constitutional question of voluntariness is a mixed question of law and fact and, therefore, subject to *de novo* review on appeal. *Smith v. State*, 220 Md. App. 256, 272 (2014); *see also State v. Tolbert*, 381 Md. 539, 557 (citing *Winder v. State*, 362 Md. 275, 310 (2001)), *cert. denied*, 543 U.S. 852 (2004).

"In Maryland, when the State intends to use a confession or admission given by the defendant to the police during custodial interrogation, the prosecution must, upon proper challenge, establish by a preponderance of the evidence that the statement satisfies the mandates of *Miranda v. Arizona*, and, that the statement is voluntary." *Tolbert*, *supra*, 381 Md. at 557. A suspect's waiver of *Miranda* rights is valid if "the totality of the circumstances surrounding the interrogation reveals both an uncoerced choice and the requisite level of comprehension." *Lee*, *supra*, 418 Md. at 150 (internal quotations marks omitted) (citing *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). In *Lee*, the Court of Appeals articulated the standard as follows:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness

4

of both the nature of the right being abandoned and the consequences of the decision to abandon it.

*Id.* (citing *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

    *A. Ford's Unsolicited Remarks to Detective Ballard Were Voluntary.*

Ford concedes that his remarks to Detective Ballard were unsolicited and, therefore, not subject to *Miranda*. Ford contends, however, that his remarks were involuntary due to his "weakened and distressed mental and physical state." In our view, the record of the suppression hearing does not support this conclusion.

Under federal and Maryland constitutional law, a statement is involuntary if it results from "police conduct that overbears the will of the suspect and induces the suspect to confess." *Lee*, *supra*, 418 Md. at 159. Under Maryland non-constitutional law, a statement is involuntary when a suspect "is so mentally impaired that he does not know or understand what he is saying, or when the confession is induced by force, undue influence, improper promises, or threats." *Rodriguez v. State*, 191 Md. App. 196, 224 (2010) (internal quotation marks omitted) (quoting *Hoey v. State*, 311 Md. 473, 482-83 (1988)). To determine whether a suspect's statement was voluntary, the trial court must consider the totality of the circumstances, including, *inter alia*, "the length of the interrogation, the manner in which it was conducted, the number of police officers present throughout the interrogation, and the age, education and experience of the suspect." *Winder v. State*, 362 Md. 275, 307 (2001).

In the case *sub judice*, Ford's remarks to Detective Ballard were voluntary notwithstanding his mental and physical ailments. Although Ford suffers from mental

5

illness, the circuit court found that Ford was not exhibiting any symptoms on the day of the arrest. Detective Ballard observed Ford walking on the street and testified that he was "walking fine." Later, Ford had no trouble walking from the patrol car into CID. Although Ford complained of low blood sugar, Detective Ballard testified that Ford was responsive and appeared to be "coherent and awake." Indeed, Ford stopped talking after receiving his *Miranda* warnings from Detective Ballard, suggesting that he could understand the information and act accordingly. The record reflects that Ford knew what he was saying and that his will was not overborne by Detective Ballard's conduct.

    *B. Ford's Statement to the Police at CID Was Voluntary.*

Ford also claims that his statement to the detectives at CID was involuntary. We disagree. As a preliminary matter, we observe that the general location and manner of Ford's interrogation was neither intimidating nor coercive. The interrogation room at CID is seven feet by ten feet in size, with three chairs, a table, and a window. Ford was handcuffed, and one of his ankles was shackled to the ground. The detectives were unarmed, and Detective Harding was dressed in business attire. The interrogation lasted about an hour, and Ford concedes that Detective Harding did not mistreat him or threaten him.

Ford argues that his physical and mental condition at the time of the interrogation rendered his statement involuntary. Detective Harding and Detective McNemar testified, however, that Ford appeared coherent. Although Ford reported feeling cold -- a possible symptom of low blood sugar -- he was provided with soda upon request. As for his injured arm, Ford did not report any pain until much later in the interview, when the detectives

6

were already preparing to call a paramedic. Based on the video of the interrogation and the detectives' testimony, the circuit court found that Ford "was coherent and aware" during the interrogation and that he "had a basic understanding of his rights." The circuit court further found "no signs that [Ford] was experiencing any side effects from low blood sugar" or "that he was so impaired at the time of the interrogation that he was unaware of what he was saying." Because we cannot say that these findings were clearly erroneous, we hold that Ford's confession at CID was voluntary.

Ford contends, nonetheless, that his confession at CID was the result of improper inducement. A statement obtained by threat or promise of advantage is involuntary under Maryland law regardless of the other circumstances, "unless the State can establish that such threats or promises in no way induced the confession." *Hill*, *supra*, 418 Md. at 75-76. An improper inducement occurs when the following conditions are satisfied:

> (1) any officer or agent of the police force promises or implies to a suspect that he will be given special consideration from a prosecuting authority or some other form of assistance in exchange for the suspect's confession, and (2) the suspect makes a confession in apparent reliance on the police officer's explicit or implicit inducement.

*Id.* at 76 (citing *Hillard v. State*, 286 Md. 145, 153 (1979)).

Turning to the case at hand, the record shows that Detective Harding and Detective McNemar made no threats or promises during their interrogation of Ford. Ford rests his claim of improper inducement on the following exchange:

> QUESTION: You're cold? Oh, it's kind of warm in here. Um, the officers that brought you in said that you -- you were bleeding. Do you need medical assistance?

7

ANSWER:  Yeah, I need stitches (unintelligible).

QUESTION:  You need stitches?

ANSWER:  Mm-hm.

QUESTION: Okay.  All right, do you, okay, so really fast then, um, so that we can get that started, um, the officer that brought you in said that, um, he read you -- he advised you of your rights and that sort of thing . . .

ANSWER:  Mm-hm.

QUESTION:  . . . but we have to do it again, okay?  Like I said, um, you know, you watch TV, you -- you know, you -- you know that because you're here and you're in custody we have to advise you and let you know, um, what your rights are.  Um, do you read and write in English?
ANSWER:  N--not good, no.

There is no improper inducement here.  Although there was a delay in providing medical treatment, Detective Harding gave no indication that Ford would be denied medical treatment if he refused to give the desired answer.  Indeed, Detective Harding proceeded to inform Ford for the second time that he had the right to remain silent.  After reading Ford his *Miranda* rights, Detective Harding mentioned that she was "kind of going fast" because they had to "see what's going on with [his] arm."  Based on these remarks, Ford could expect to receive medical treatment even if he refused to provide an inculpatory statement.

C. *Ford's Waiver of His* Miranda *Rights Was Knowing and Voluntary.*

Ford received two separate *Miranda* warnings prior to his interrogation at CID.  Ford nonetheless proceeded to give a highly incriminating statement without the presence or input of an attorney, thereby waiving his *Miranda* rights.  Ford argues, however, that his

8

"weakened and distressed mental and physical state" led him to involuntarily waive his *Miranda* rights. Ford further claims that he did not sufficiently understand the *Miranda* warning because he is "not able to read and write well."

It is undisputed that Detective Harding advised Ford of his *Miranda* rights verbally, proceeding line-by-line. Ford signed each line and verbally affirmed that he understood his rights. As we explain *supra,* the circumstances of Ford's interrogation reveal no intimidation or coercion, and the record shows that Ford was coherent, responsive, and aware of his rights. We hold, therefore, that Ford knowingly and voluntarily waived his *Miranda* rights.

Accordingly, the State carried its burden at the suppression hearing in showing, by the preponderance of the evidence, that Ford's custodial statements were voluntary and consistent with *Miranda*. We hold, therefore, that the circuit court did not err in admitting the statements.

## II. The Circuit Court Did Not Abuse Its Discretion In Allowing Evidence of Eltahir's Character for Peacefulness.

Ford argues that the circuit court should not have allowed McQueen and Kane to testify about Eltahir's character for peacefulness. The State argues that the testimony was admissible under Maryland Rule 5-404(a)(2)(C) because Ford had argued in his opening statement that Eltahir was the first aggressor. We agree with the State.

A trial court has "wide latitude" to control the admissibility of evidence, and we review such decisions under an abuse of discretion standard. *Taneja v. State*, 231 Md. App. 1, 11 (2016), *cert. denied*, 452 Md. 549 (2017) (citing *Sifrit v. State*, 383 Md. 116, 128

9

(2004)).  A trial court abuses its discretion when it acts "in an arbitrary or capricious manner" or "beyond the letter or reason of the law."  *Id.* at 11-12 (quoting *Cooley v. State*, 385 Md. 165, 175 (2005)).  When a trial court allows a party to present rebuttal testimony, we will reverse the ruling "only if it is manifestly wrong and substantially injurious." *Johnson v. State*, 228 Md. App. 27, 56 (2016), *cert. denied*, 450 Md. 120 (2016) (internal citations omitted).

In general, "evidence of a person's character or character trait is not admissible to prove that the person acted in accordance with the character or trait on a particular occasion."  Md. Rule 5-404(a)(1).  In a homicide case, however, "the prosecutor may offer evidence of the alleged victim's trait of peacefulness to rebut evidence that the victim was the first aggressor."  Md. Rule 5-404(a)(2)(C).  Here, the State asked McQueen and Kane about Eltahir's character for peacefulness before Ford offered any evidence that Eltahir was the first aggressor.  McQueen testified that Eltahir was a "quiet, nice person" and "[n]ice to everybody."  Kane called Eltahir "a cool person" and said, "He was never, you know nasty or hostile, or anything."  The State argues that this testimony was warranted by Ford's opening statement, which clearly presented Eltahir as the first aggressor and strongly signaled that evidence would be produced on this point:

> What Mr. Ford chose to do that night was to defend himself. . . . [Eltahir] is a security guard, he was drinking that night. *You are going to hear evidence that* [Eltahir] is younger than Mr. Ford, bigger than Mr. Ford, and stronger than Mr. Ford. *And Mr. Ford is not the person that initiates any physical contact, that's [Eltahir].*
>
> *So Mr. Ford finds himself being attacked* by someone that's larger, someone that's stronger, someone that's faster,

10

and someone that's bigger. *And Mr. Ford makes a choice to defend himself. Mr. Ford is forced to react.* The only goal that Mr. Ford had that day was to defend himself, and to make sure that he didn't get hurt.

\* \* \*

[Eltahir's] death is certainly tragic, but it is not at all intentional. *So I ask you to listen to all the evidence presented* before you make a decision *and you'll realize* that Mr. Ford was in a situation where he was outmatched. He was in a situation where he was reacting out of fear, and *that he certainly wasn't the aggressor.*

He made an offhand verbal comment but *he was not the physical aggressor.*

(Emphasis added). The question, then, is whether the circuit court reasonably interpreted Maryland Rule 5-404(a)(2)(C) as allowing the testimony of McQueen and Kane in these circumstances.

It is well established in Maryland that opening statements are not evidence. *See* Maryland Criminal Pattern Jury Instructions 3:00 (2d ed., 2016 suppl.) ("Opening statements and closing arguments of lawyers are not evidence."); *see also Dashiell v. State*, 214 Md. App. 684, 694 (2013) ("An opening statement, of course, is not evidence . . ."). The State argues, however, that if a defendant clearly signals in his opening statement that he intends to introduce certain evidence, the State may rebut that evidence immediately, without waiting for it to be admitted.

In support of this position, the State points to *Snyder v. State*, a case involving a defendant who was convicted of murdering his wife. 361 Md. 580 (2000). At trial, the State introduced evidence that Snyder had hit his wife. *Id.* at 610-611. On appeal, Snyder

11

argued that the evidence was impermissible character evidence that should not have been admitted. *Id.* at 601. The Court of Appeals held that the evidence was admissible to prove that Snyder had a motive for killing his wife. *Id.* at 610-611. The Court of Appeals went on to explain in dicta that, even if the evidence were not admissible to prove motive, it was nonetheless admissible as rebuttal evidence:

> Yet, even if we agreed with the petitioner that such acts are not admissible to prove motive, evidence that the petitioner hit his wife, as well as evidence of more specific physical disputes, are admissible as rebuttal evidence. In this case, the petitioner's attorney during opening statement reiterated the petitioner's sworn statement to the police that the petitioner's relationship with his wife was "great and getting better," suggesting that it was improbable that the petitioner murdered his wife. The State was entitled to rebut *that evidence*.

*Id.* at 611 (emphasis added). Although the Court of Appeals did not explicitly extend its reasoning to rebuttal evidence offered under Maryland Rule-5-404(a)(2)(C), the quoted passage clearly contemplates that, in certain circumstances, a defendant's opening statement will open the door to rebuttal evidence that would otherwise be inadmissible.

In addition to the Court of Appeals's opinion in *Snyder*, the State refers us to a line of cases addressing anticipatory rehabilitation. In *Hopkins v. State*, we considered whether the trial court erred in allowing the State to introduce a prior consistent statement to rehabilitate a witness whose credibility had not yet been attacked. 137 Md. App. 200 (2001). We held that the prior consistent statement was admissible because the defendant attacked the witness's credibility in his opening statement. *Id.* at 208. We went on to give the following guidance on remand:

12

> During the retrial of this case, if the opening statement of appellant's trial counsel predicts that jurors will receive evidence that would -- when presented -- "open the door" to the introduction of the witness's prior consistent statement, the trial judge would have discretion under Md. Rule 5-611(a) to admit that statement during the witness's direct examination, provided that the trial judge finds that the statement "detracts from the [witness's] impeachment" and is therefore admissible under Md. Rule 5-616(c)(2).

*Id.* Similarly, in *Fullbright v. State* we affirmed the trial court's decision to allow rehabilitation on direct examination, rather than redirect, because the witness's credibility was attacked in the defendant's opening statement. 168 Md. App. 168, 183-85 (2006). Quoting *Hopkins*, we held that anticipatory rehabilitation evidence may be introduced during direct examination if the defendant's opening statement "predicts that jurors will receive evidence that would -- when presented -- 'open the door' to the rehabilitation evidence." *Id.* (internal brackets and quotation marks omitted). In *Hopkins* and *Fullbright*, we reasoned that anticipatory rehabilitation is within the discretion of the trial court under Maryland Rule 5-611(a), which provides the following:

> The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.

In short, *Snyder*, *Hopkins*, and *Fullbright* support the proposition that, in certain circumstances, a trial court may sometimes allow evidence to be introduced outside of the usual order when warranted by the opposing party's opening statement.

13

Turning to the case at hand, we need not decide whether Maryland Rule 5-611(a) allows a trial court to admit rebuttal evidence under Maryland Rule 5-404(a)(2)(C) in response to the defendant's opening statement. We need only decide whether the circuit court's answer to this question was reasonable under the circumstances. We hold that the circuit court reasonably allowed McQueen and Kane to testify to Eltahir's character for peacefulness in response to Ford's opening statement.

In order to establish his claim of self-defense, Ford needed to prove that he was not the first aggressor. *See Thomas v. State*, 143 Md. App. 97, 113 (2002) ("The accused claiming the right of self-defense must not have been the aggressor or provoked the conflict."). But Ford could not do so without also proving that Eltahir *was* the initial aggressor. Indeed, in his opening statement Ford clearly stated that Eltahir was the first aggressor and strongly suggested that he would introduce evidence to prove it.[1] It is well-established that the purpose of an opening statement in a criminal case is "to inform the trier of facts of the issues involved and what evidence will be offered as proof to resolve those issues." *Allen v. State*, 318 Md. 166, 178-79 (1989); *see also Miles v. State*, 88 Md. App. 360, 387 (1991). In these circumstances, it was reasonable for the circuit court to conclude that the foreshadowed evidence was indeed forthcoming and that, consequently,

---

[1] Ford says that "any statement by defense counsel to the effect that Eltahir was the first aggressor was based, in part, on evidence referred to by the State in its opening statement and introduced in the State's case-in-chief." Because the question of who was the first aggressor was crucial to Ford's theory of self-defense, we are not convinced that Ford's opening statement was merely reactive. The relevant question, moreover, is not whether the State raised the issue first, but whether the circuit court could reasonably anticipate the introduction of evidence that Eltahir was the first aggressor.

14

the exact ordering of testimony and rebuttal was a matter within its sound discretion under Rule 5-611(a).[2]

The reasonableness of the court's conclusion here is underscored by the three decisions discussed above -- *Snyder*, *Hopkins*, and *Fullbright* -- allowing trial courts to admit otherwise inadmissible evidence for the purpose of anticipatory rehabilitation and rebuttal. Because Maryland Rule 5-611(a) gives trial courts the discretion to allow anticipatory rehabilitation, it could reasonably be interpreted as providing trial courts the discretion to allow anticipatory rebuttal evidence under Maryland Rule 5-404(a)(2)(C).[3] Such a conclusion would be consistent with the dicta in *Snyder*, which would allow the anticipatory rebuttal of evidence referenced in an opening statement. Under these circumstances, we cannot say that the trial court acted in an arbitrary or capricious manner.

---

[2] If we were to adopt Ford's view that Maryland Rule 5-404(a)(2)(C) allows the trial court no flexibility in the order of presentation, we would give homicide defendants an unwarranted strategic advantage. A defendant would be allowed, for example, to impugn the victim's character in his opening statement, but then refrain from offering evidence on the point, thereby leaving the State with no means to dispel the shadow hanging over its case. *See Fullbright*, *supra*, 168 Md. App. at 185 (noting that, if anticipatory rehabilitation were prohibited, "appellant would have an unwarranted advantage in impeaching a witness with an assurance that his credibility would remain impaired" (internal quotation marks omitted)).

[3] Ford cites cases from other jurisdictions in asking us to adopt a restrictive interpretation of Maryland Rule 5-404(a)(2)(C). We do not find these cases persuasive. Indeed, we cannot conclude that the circuit court's ruling is unreasonable merely because a few courts in other states may have taken a different view.

15

We hold, therefore, that the circuit court did not abuse its discretion in allowing McQueen and Kane to testify to Eltahir's character for peacefulness.[4]

### III. The Circuit Court Did Not Abuse Its Discretion In Allowing Brown to Testify Regarding Ford's Reaction to Being Told That He Had to Leave Her House.

At trial, Brown testified that Ford "cursed [her] out" and "slammed the front door" when she refused to let him stay at her house any longer. Ford contends that Brown's testimony amounted to impermissible character evidence and that, insofar as it was offered to show "consciousness of guilt," it was irrelevant. Even if Brown's testimony had some probative value, Ford argues that its probative value was outweighed by the risk of undue prejudice. We disagree. Brown's testimony was admissible to show Ford's guilty state of mind. Further, the circuit court did not abuse its discretion in concluding that the probative value of the testimony outweighed the risk of undue prejudice and considerations of cumulative evidence.

*A. Brown's Testimony Was Admissible to Show Ford's Guilty State of Mind.*

Because trial courts do not have the discretion to admit irrelevant evidence, we review a trial court's determination of relevancy *de novo*. *State v. Simms*, 420 Md. 705, 724-725 (2011); *see also* Md. Rule 5-402 ("Evidence that is not relevant is not admissible."); *see also Parker v. State*, 408 Md. 428, 437 (2009) ("When the trial judge's

---

[4] In allowing the testimony, the trial judge referred to an earlier discussion that she had with counsel about the "opening the door" doctrine. The focal point of that discussion was *Terry v. State*, which says that an opening statement may "open the door" for the opposing party to introduce otherwise inadmissible evidence. 332 Md. 329, 337 (1993). The "opening the door" doctrine "is really a rule of expanded relevancy." *Id.* As such, it is not, strictly speaking, applicable to the case at hand, where the evidence in question is relevant but goes to character.

ruling involves a legal question, however, we review the trial court's ruling de novo."); *see also Ruffin Hotel Corp. of Md. v. Gasper*, 418 Md. 594, 620 (2011) ("Maryland Rule 5-402, however, makes it clear that the trial court does not have discretion to admit irrelevant evidence."). In general, "evidence of a person's character or character trait is not admissible to prove that the person acted in accordance with the character or trait on a particular occasion." Md. Rule 5-404(a)(1).

Here, Brown's testimony was not introduced to show Ford's temper, but as evidence that Ford had a guilty state of mind.[5] Such evidence is admissible so long as it is relevant and its probative value is not outweighed by the risk of undue prejudice, as we explained in *Wagner v. State*:

> It is well established in Maryland that, "[i]f relevant, circumstantial evidence regarding a defendant's conduct may be admissible under Md. Rule 5-403, not as conclusive evidence of guilt, but as a circumstance tending to show a consciousness of guilt."

213 Md. App. 419, 465 (2013) (quoting *Decker v. State*, 408 Md. 631, 640 (2009)). Consciousness of guilt evidence may include "flight after a crime, escape from confinement, use of a false name, and destruction or concealment of evidence." *Decker v. State*, 408 Md. 631, 640-41 (2009) (internal citations omitted). Such evidence is admissible because "the particular behavior provides clues to the person's state of mind," which is

---

[5] Although portions of the exchange between the State and the trial judge are not recorded in the transcript, the gist is clear enough. The State explained to the trial judge that Brown's testimony "goes to consciousness of guilt." The State expressly denied that it was offering character evidence, saying, "I have stayed away from the whole temper thing, based on what the Court has said so far, and I'm not going to ask her anything about his reputation or any of that, just what he did that morning."

17

relevant "because the commission of a crime can be expected to leave some mental traces on the criminal." *Id.* (quoting *Thomas v. State*, 372 Md. 342, 351 (2002)). Evidence of post-crime conduct must satisfy four inferences to be admissible to show consciousness of guilt:

> (1) from the defendant's conduct, a desire to evade prosecution or conceal evidence; (2) from a desire to evade prosecution or conceal evidence, consciousness of guilt; (3) from consciousness of guilt, consciousness of guilt with respect to the charged offenses; and (4) from consciousness of guilt with respect to the charged offenses, actual guilt.

*Wagner v. State*, 213 Md. App. 419, 465 (2013) (citing *Thomas v. State*, 397 Md. 557, 576 (2007)).

In the case at hand, Ford's reaction to being told that he had to leave Brown's house tended to show his guilty state of mind. Because Ford was staying at Brown's house to hide from the police, Ford's conduct was analogous to "flight after a crime, escape from confinement, use of a false name, and destruction or concealment of evidence." *Decker*, *supra*, 408 Md. at 640-41. When Brown told Ford that he could no longer stay at her house, Ford's reaction tended to show that he was desperate to avoid the legal consequences of his actions. A jury could reasonably conclude that Ford's desperation was one of the "mental traces" left on his mind by his recent crime.

Ford posits a number of alternative psychological explanations for his angry reaction. The possibility of an innocent explanation, however, is not sufficient to render the evidence inadmissible. *See Wagner*, *supra*, 213 Md. App. at 465 ("Simply because there is a possibility that there exists some innocent, or alternate, explanation for the

18

conduct does not mean that the proffered evidence is *per se* inadmissible.") (quoting *Thomas v. State*, 397 Md. 557, 576 (2007)). As the Court of Appeals has explained,

> To be relevant, it is not necessary that evidence of this nature conclusively establish guilt. The proper inquiry is whether the evidence *could* support an inference that the defendant's conduct demonstrates a consciousness of guilt. If so, the evidence is relevant and generally admissible.

*Simms*, *supra*, 420 Md. at 727 (emphasis in original). Although other explanations are possible, Brown's testimony *could* support an inference that Ford's conduct demonstrates a consciousness of guilt. We hold, therefore, that Brown's testimony was both relevant and admissible to show Ford's guilty state of mind.

> *B. The Circuit Court Did Not Abuse Its Discretion In Admitting Brown's Testimony.*

Ford argues that the probative value of Brown's testimony was outweighed by "the danger of the jury taking [Ford's] reaction to Brown as evidence of the character trait of aggressiveness or hot-temperedness, and inferring action in conformity therewith in the encounter with Eltahir." Ford points out that "there was already evidence from which the jury could infer that his being at Brown's residence was consciousness of guilt." We hold that the circuit court acted within its discretion.

To be sure, Maryland Rule 5-403 allows a trial judge to exclude relevant evidence based on "*the danger of unfair prejudice*, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or *needless presentation of cumulative evidence*." Md. Rule 5-403 (emphasis added). We have consistently held, however, that "[t]his inquiry is left to the sound discretion of the trial judge and will be reversed only

19

upon a clear showing of abuse of discretion." *Thomas v. State*, 168 Md. App. 682, 713 (2006), aff'd, 397 Md. 557 (2007) (quoting *Malik v. State*, 152 Md. App. 305, 324 (2003)); *see also Simms*, *supra*, 420 Md. at 724 (noting that trial courts have "wide discretion when weighing the relevancy of evidence"); *see also Parker*, *supra*, 408 Md. at 437 (2009) ("When the trial judge's ruling involves a weighing, we apply the more deferential abuse of discretion standard.").

In the case at hand, the circuit court was in the best position to weigh the probative value of Brown's testimony against countervailing considerations. Because the circuit court had wide discretion in this inquiry, we will not disturb its ruling in the absence of clear abuse. In our view, a reasonable trial judge could have concluded that the details of Ford's emotional reaction, far from being cumulative, showed his desperation and strengthened the overall inference that he had a guilty state of mind. As for the risk of undue prejudice, we are not convinced that Brown's testimony was, on its own, likely to give rise to an improper inference about Ford's character.[6] We hold, therefore, that the circuit court did not abuse its discretion in admitting Brown's testimony.

---

[6] The State did invite such an improper inference in its closing argument, saying, "Sheila Brown told him he had to leave and he didn't like it. And what was his reaction when he didn't like being told he had to leave? His reaction was that he cursed, slammed doors, and raged around. You can contrast that with the defendant [apparently meaning Eltahir] who was easy going." Because Ford did not object to the State's use of Brown's testimony in its closing argument, our review is limited to the risk of undue prejudice presented by the testimony itself.

## IV. The Circuit Court Did Not Abuse Its Discretion In Limiting Ford's Cross-Examination of Kane.

Ford argues that the circuit court improperly barred him from impeaching Kane with an excerpt from Kane's interview with police, thereby violating his rights under the Confrontation Clause of both the federal and state constitutions.[7] During his cross-examination of Kane, Ford wanted to use the following exchange as a prior inconsistent statement:

> QUESTION: All right, good, that's fine. All right, so you see, so this guy, Ford, comes over, says something derogatory about I want your sister and he jumped, ah, Mohamed jumps up and then he lunges at, um Ford, you know, 'cause they're, he's upset . . .
>
> [KANE]: Yeah, he . . .
>
> QUESTION: . . . about him?
>
> [KANE]: Yeah.
>
> QUESTION: And then they get, and then you start to walk away 'cause you don't want no part of it.
>
> [KANE]: Right.

Ford argued that Kane, in giving an affirmative response to the detective's narrative, had effectively adopted that narrative, thereby allowing Ford to treat the question and answer

---

[7] We agree with Ford that his general objection at trial was sufficient to preserve the Confrontation Clause issue for our review. *See Graves v. State*, 334 Md. 30, 37-38 (1994) (holding that the defendant's general objection to a witness's testimony preserved "all grounds . . . as to that testimony," including Confrontation Clause grounds); *see also* Md. Rule 4-323(b) ("The grounds for the objection need not be stated unless these rules expressly provide otherwise or the court so directs.").

21

together as a prior inconsistent statement.  The trial judge disagreed, questioning the reliability of the officer's narrative:

> There's no reliability, and there's no foundation for asking that.
> You have no idea why they asked that question to come up with
> those facts, in that manner.

Rejecting the notion that Kane had adopted the officer's narrative, the trial judge forbade Ford from quoting the officer's words in his questioning of Kane:

> So, if you want to ask him what he told the police, you want to
> ask him how he responded to the police, that's different with
> his words.  Not their words.  You're trying to turn their words
> into his.

We hold that the circuit court acted within its discretion in barring this line of questioning.

A defendant is generally allowed to attack a witness's credibility through questions directed at proving that the witness has made statements that are inconsistent with the witness's present testimony.  Md. Rule 5-616(a).  A trial court has wide latitude, however, to control the admissibility of evidence.  *Taneja*, *supra*, 231 Md. App. at 11.  Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury."  Md. Rule 5-403.

In the case at hand, it is not clear that that the excerpt in question constitutes a prior inconsistent statement.  Because Kane was responding to a compound question, he may not have intended his affirmative response to encompass every part of the narrative put forward by the officer.  Indeed, Kane was not finished responding when the officer interrupted him, and he may have intended to limit his affirmation to a particular facet of the narrative.  More broadly, the circuit court reasonably questioned whether Kane's

22

"adopted statement" could be helpful to the jury without any context to explain the basis of the underlying statement. Because the officer questioning Kane did not witness the altercation, the version of events that he presented to Kane -- if it was at all reliable -- must have been derived from Kane's previous answers. Those statements, however, were not offered at trial. Ford was essentially asking Kane to play a game of telephone with himself -- to affirm or deny his ambiguous response to a third party's reformulation of his prior statements. There was a risk, moreover, that the officer had injected his own inferences and assumptions into the narrative that he presented to Kane.

To be sure, "the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Delaware v. Van Arsdall*, 475 U.S. 673, 678-79 (1986) (quoting *Davis v. Alaska*, 415 U.S. 308, 316-17 (1974)); *see also Peterson v. State*, 444 Md. 105, 122 (2015) ("The right of confrontation includes the opportunity to cross-examine witnesses about matters relating to their biases, interests, or motives to testify falsely."). A defendant must be "permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." *Martinez v. State*, 416 Md. 418, 428 (2010) (quoting *Davis*, *supra*, 415 U.S. at 318); *see also Smallwood v. State*, 320 Md. 300, 307 (1990) (stating that a trial court must afford a defendant the "constitutionally required threshold level of inquiry.").

At the same time, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the

23

witness' safety, or interrogation that is repetitive or only marginally relevant." *Van Arsdall*, *supra*, 475 U.S. at 678-79; *see also Martinez*, *supra*, 416 Md. at 428 ("The court, nevertheless, 'must allow a defendant wide latitude to cross-examine a witness as to bias or prejudices' so long as the questioning does not 'obscure the trial issues and lead to the factfinder's confusion.' ") (quoting *Smallwood*, *supra*, 320 Md. at 307-08).

Here, the circuit court reasonably found that Kane's supposed prior statement was ambiguous without further context and that, consequently, Ford's line of questioning was likely to confuse both Kane and the jury. The circuit court did not prevent Ford from using Kane's interview with the police to impeach him; the court merely asked that Ford impeach Kane with his own words and not the words of a third party. Indeed, Ford's counsel proceeded to impeach Kane with another portion of the excerpt. Ford's counsel asked Kane if he had said to the police, "And then Mohamed got up." When Kane responded that he couldn't recall, Ford's counsel referred Kane to another part of the transcript where he had, indeed, said, "And then Mohamed got up." As this line of questioning shows, the circuit court's ruling did not prevent Ford from exposing inconsistencies in Kane's testimony, from which the jury could infer that Kane was an unreliable witness. Ford was allowed, therefore, the "constitutionally required threshold level of inquiry" into Kane's credibility. Because the circuit court acted properly within its discretion and in accordance with constitutional law, we affirm the judgment of the circuit court.

> **JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

24